FILED
IN COURT
ASHEVILLE, N. C.

OCT - 8 2003

U. S. DISTRICT COURT
W. DIST. N. C.

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | DOCKET NO. 1:0WCR1ST-7QF |
| ) | |
| v. ) | **BILL OF INDICTMENT** |
| ) | |
| ROBERT WARREN, ) | Vio: 18 U.S.C. § 225 |
| VIKI WARREN, ) | 18 U.S.C. § 371 |
| R & V WARREN FARMS, INC., ) | 18 U.S.C. § 1014 |
| GEORGE T. KISER, ) | 18 U.S.C. § 1341 |
| DEMETRIO JAIMES, ) | 18 U.S.C. § 1503 |
| HAROLD DEAN COLE, ) | 18 U.S.C. § 1623 |
| THOMAS JEFFREY MARSH, ) | 18 U.S.C. § 1956(h) |
| Defendants. ) | 18 U.S.C. § 1957 |
| ) | 18 U.S.C. § 982 |
| ) | 18 U.S.C. § 2 |

## THE GRAND JURY CHARGES:

### INTRODUCTION

1. Beginning in or about 1997, and continuing through the present, ROBERT WARREN,

VIKI WARREN, R & V WARREN FARMS, INC. ("WARREN FARMS"), GEORGE T. KISER,

DEMETRIO JAIMES, HAROLD DEAN COLE, and THOMAS JEFFREY MARSH devised or

joined in an elaborate scheme to defraud crop insurance companies of funds ultimately reimbursed

by the United States of America. They filed false applications for crop insurance and then filed false

claims of loss under these policies. They created thousands of false, altered, and forged documents

to support their fraudulent insurance claims. They fabricated evidence of crop damage, including

ordering WARREN FARMS employees to throw ice cubes onto a tomato field, to beat the plants

with sticks, and then to take photographs of this to support a false claim of a massive hail storm. In

total, ROBERT WARREN, VIKI WARREN, and WARREN FARMS, INC. (together "the

Case 1:03-cr-00076-MR-DLH Document 3 Filed 10/08/03 Page 1 of 44

WARRENS") received more than $9,280,000 as a result of this fraud, while filing other false claims in efforts to obtain even more.

2. The WARRENS owned or leased land in North Carolina, South Carolina, and Tennessee and employed numerous persons to grow, harvest, pack, and market tomatoes, strawberries, and other crops. Fresh market tomatoes accounted for the large majority of their business. At all times relevant to this indictment, WARREN FARMS was owned, in equal shares, by ROBERT and VIKI WARREN, who are husband and wife. Its registered office and a packing house were at 304 Beaver Dam Road, Candler, North Carolina, in Buncombe County, in the Western District of North Carolina. The WARRENS also had a packing house at 4 Hoopers, Lane, Horseshoe, North Carolina, in the Mills River area of Henderson County, also in the Western District of North Carolina.

3. ROBERT WARREN was president of WARREN FARMS. During the course of this scheme, he was primarily responsible for dealing with the crop insurance companies, including misrepresenting to those companies the amount and sources of production from various farms and the years and amounts of previous production from such farms. He was also responsible for signing the various false documents submitted to those companies in support of applications for insurance coverage and insurance indemnity payments, and for directing employees to stage false weather disasters and to create forged letters from other businesses which were then submitted in support of the insurance claims.

4. VIKI WARREN was vice-president of WARREN FARMS. During the course of this scheme, she was primarily responsible for the creation of false planting, picking, sales, and shipping records which were submitted to the insurance companies and the United States to support the false and fraudulent insurance applications and claims.

2

Case 1:03-cr-00006-RVB-BLH Document 3 Filed 10/08/03 Page 2 of 44

5. GEORGE T. KISER ("KISER") was a licensed insurance agent specializing in the federal crop insurance program. He was a co-owner, with his wife, of the Kiser & Kiser Agency, based in Lebanon, Virginia. For the crop years 1997 through 2000, KISER was the insurance agent who sold crop insurance policies to the WARRENS. These policies were with companies named Rain & Hail and E.L. Ross, both of which were affiliated with the Cigna Property and Casualty Insurance Company, and with Ace Property and Casualty Insurance Company, which were insurance companies which had reinsurance agreements with the Federal Crop Insurance Corporation ("FCIC"). KISER taught the WARRENS how federally subsidized crop insurance works, and assisted them in defrauding the insurance companies and the FCIC from 1997 through 2000. He also assisted the WARRENS in their efforts to defraud another insurance company and the FCIC for the 2002 crop year. KISER had a duty to protect the insurance companies which he represented from the very frauds which he assisted, and those companies paid him commissions of approximately $251,566 for the fraudulent policies he helped the WARRENS obtain.

6. DEMETRIO JAIMES ("JAIMES") was an employee of WARREN FARMS. He began working for the WARRENS in or about 1989, and was one of their highest ranking employees. He assisted the Warrens in supervising the full-time employees. He furthered the scheme, among other ways, by assisting in staging false weather-related damage, by signing false documents which were submitted to the insurance companies, and by providing false testimony before the Grand Jury as it investigated this scheme.

7. HAROLD DEAN COLE ("COLE") was employed by the WARRENS for the 2001 crop year. He was in charge of the agricultural chemical spraying programs for the WARRENS' crops. Before 2001, COLE had had extensive dealings with the WARRENS in his capacity as an employee

3

of a company that sold agricultural chemicals to the WARRENS each year. He assisted the scheme, among other ways, by creating false spraying records which were then submitted by the WARRENS to the insurance company and to the United States, and by providing false testimony before the Grand Jury as it investigated this scheme.

8. THOMAS JEFFREY MARSH ("MARSH") was a crop insurance claims adjuster who performed claims adjustment work on behalf of E.L. Ross and Rain and Hail in 1997 through 2000. He assisted the scheme, among other ways, by certifying false claims of damage, false acreage numbers, and false production figures off of various WARREN farms in North Carolina and South Carolina.

### *False Representations – Generally*

9. Between 1997 and the present time, the WARRENS and the other defendants made numerous false representations to private insurance companies and, ultimately, to the United States. As a result of these false representations, the WARRENS unlawfully obtained crop insurance, indemnity payments, and premium subsidies, all under the Federal Crop Insurance Program ("FCIP").

10. The FCIP functions through the FCIC, which is a wholly-owned entity and agency of the United States Department of Agriculture ("USDA"), created for the purpose of providing insurance to crop farmers for unavoidable crop losses. The FCIC provides crop insurance through a reinsurance program under which private insurance companies sell and service crop insurance policies in their own names and the FCIC reinsures a portion of the risks. The FCIC also subsidizes a portion of the insurance premiums on certain policies. The FCIC is managed by the Risk

4

Case 5:03-cr-00076-RVB-BLH Document 3-3 Filed 10/08/03 Page 4 of 44

Management Agency ("RMA"), an agency of the USDA. The terms FCIC and RMA are frequently used interchangeably.

11. An FCIC insurance policy would provide payment to a farmer when bad weather (freeze, hail, etc.) or other such unavoidable events caused the harvest for a farm to be less than an amount specified in the insurance contract, or "written agreement," which usually is premised on four or more years of production records for a particular crop grown by a farmer on a specific farm, designated by its unique Farm Serial Number ("FSN").

12. To obtain such policies and to have more favorable coverage and rates for these policies, the WARRENS repeatedly provided false information about the history of their production on particular farms, the dates they submitted their insurance applications, and the dates they planted on their tomato farms.

### False Representations – 1997

13. The WARRENS, with the assistance of KISER, first sought crop insurance in 1997. Since they did not keep records of production by farm, they simply created false historical production figures for each farm and fraudulently represented these figures as being based on actual records. For instance, on or about February 28, 1997, the WARRENS and KISER submitted several "Production and Yield Reports," showing four years of false production history on three farms in Buncombe County and on four of five farms in Henderson County. The fifth farm in Henderson County had three years of false production history. Thus, from the very beginning of their involvement with the federal crop insurance program, the WARRENS engaged in fraud by providing false information, relied upon by the insurance company and the FCIC, to be used to determine the guaranteed yields for the insured farms.

5

Case 1:03-cr-00076-MR-DLH Document 3-3 Filed 10/08/03 Page 5 of 44

14. Additionally, in 1997 the WARRENS and KISER falsely represented the WARRENS' insurance application date for their South Carolina crop. For the application even to be considered, the crop insurance program required the completion of the application for the 1997 crop year by January 15, 1997. Although the application for the Spartanburg County farm, FSN 2336, was signed by ROBERT WARREN and by KISER on February 12, 1997, the date was fraudulently changed and backdated to January 12, 1997, on the copy submitted to E.L. Ross.

15. The WARRENS also falsified planting dates in South Carolina for their 1997 crop. For instance, ROBERT WARREN represented to E.L. Ross that WARREN FARMS had planted tomatoes on its Spartanburg farm, FSN 2336, on April 15, 1997, which was the first day allowed for planting on this farm under the policy. In fact, as ROBERT WARREN well knew, the tomato seedlings had been planted on that farm from on or about April 4, 1997, through on or about Saturday, April 12, 1997. The WARRENS' misrepresentations proved to be significant, as they ultimately received $157,712 under their insurance policy, in part because of alleged damage to their Spartanburg farm caused by cold weather in the months of April and May.

16. Finally, to fraudulently establish losses on some of the farms they had insured, the WARRENS falsely reported that they had harvested very small quantities from those farms (often too small per acre to justify actual picking), reported much larger production per acre from other farms, and reported less total production from all farms than was actually harvested.

a) For instance, with respect to the Spartanburg farm, the WARRENS represented to the insurance company that the total harvest was only 9,862 boxes of tomatoes when, as the WARRENS well knew, the harvest was approximately 78,670 boxes. As a result of this and other

6

Case 3:03-cr-00076-RV-MR-BLH Document 3-3 Filed 10/08/03 Page 6 of 44

false representations about this farm for 1997, the WARRENS received $150,388 in indemnity payments plus $7,324 applied to their insurance premiums.

b) With respect to the total production from their North Carolina and South Carolina farms, the WARRENS claimed that five of their ten farms had losses and the total harvest from the 171 acres for these five farms was only 39,254 boxes for an average of 230 boxes per acre. They claimed that the other five farms produced a total of 253,823 boxes on 83.5 acres for an average of 3,040 boxes per acre. In fact, the WARRENS had kept no records breaking down the tomato yield by farm. Rather, they had simply allocated the total tomato production for 1997 among the various insured fields, falsely claiming very small harvests off certain fields, in order to maximize the indemnity payments, while falsely inflating the supposed harvests off of non-loss units by allocating the bulk of the harvest to those non-loss units. In addition, they under-reported the total production of tomatoes in North Carolina for 1997. Rather than the 293,077 boxes WARREN FARMS reported, the actual total production was approximately 500,000 boxes.

17. In total, taking into account all of the misrepresentations described above, the WARRENS received approximately $644,467 (partly in the form of credits against premium payments) as crop insurance for the 1997 growing season.

### False Representations – 1998

18. In 1998, WARREN FARMS continued to have crop insurance coverage with E.L. Ross, and once again the WARRENS falsified planting dates for their South Carolina crop. For example, in their "MPCI Application and Reporting Form, Acreage Report," the WARRENS certified that they planted tomatoes on FSN 2336 in Spartanburg County and on FSN 3049 in Laurens County, on April 26, 1998, when actually the planting had been done between April 3 and April 16, 1998.

7

Case 3:03-cr-00076-RM-BLH Document 3-3 Filed 10/08/03 Page 7 of 44

Under the terms of the written agreement, planting had to be done between April 20 and May 20, 1998.

19. Also in 1998, the WARRENS falsely established losses on their tomato crops for both their South Carolina and North Carolina farms. Once again, the WARRENS falsely reported and certified that they had harvested very small quantities on those farms (often too small per acre to justify actual picking), reported much larger production per acre for other farms, and reported less total production from all farms than was actually harvested. In fact, however, the WARRENS had not kept records during the 1998 growing season accurately identifying the amount of production off of their farms. Rather, the WARRENS had simply allocated the total tomato production for 1998 among the various insured fields, falsely claiming very small harvests off certain fields. In addition, the WARRENS under-reported the total production of tomatoes in North Carolina for 1998.

20. In total, taking into account all of the misrepresentations described above, the WARRENS received approximately $1,277,216 (partly in the form of credits against premium payments) as crop insurance for the 1998 growing season.

### False Representations – 1999

21. For the 1999 crop year, the WARRENS again had crop insurance coverage with E.L. Ross, and again falsely allocated production for their South Carolina and North Carolina farms. As for South Carolina, the WARRENS represented that the total production for FSN 3049 was only 65.13 boxes per acre, and that the total production for FSN 3663 was only 70.72 boxes per acre. By contrast, the WARRENS represented that the total production for FSN 2336 was 186,760 boxes, or 3,248 boxes per acre. Once again, the production figures reported by the WARRENS and relied on by the insurance company and the FCIC were false. The WARRENS did not gather

8

Case 4:03-cr-00076-RV-BL-H  Document 3-3   Filed 10/08/03  Page 8 of 44

contemporaneous information, nor maintain records showing the amount of production that came from each of the three South Carolina farms. Rather, the WARRENS simply allocated the production among the three farms, falsely over-reporting the production coming off of the Spartanburg farm, a non-loss unit, and falsely under-reporting the production coming off the two loss units in Laurens County.

22. As a result of the information supplied by the WARRENS concerning the supposed losses on the Laurens County farms, they received $457,184 in indemnity payments and credits for losses they claimed they had suffered in South Carolina.

23. With respect to their total production from their North Carolina and South Carolina farms, the WARRENS claimed that 18 of their 20 farms had losses, with an average harvest of 71 boxes per acre. They claimed that the other two farms produced an average of 3,386.5 boxes per acre. In fact, however, the WARRENS had kept no records breaking down the tomato yield by farm. Rather, the WARRENS simply allocated the total tomato production for 1999 among the various insured fields. In addition, the WARRENS under-reported their total production of tomatoes in North Carolina for 1999. Rather than the 512,106 boxes the WARRENS reported, the actual total production was more than 1,000,000 boxes.

24. In total, taking into account all of the misrepresentations describe above, the WARRENS received approximately $3,876,319 (partly in the form of credits against premium payments) from the federal crop insurance program for the 1999 growing season.

9

Case 1:03-cr-00706-RMB-BLH Document 8-3 Filed 10/08/03 Page 9 of 44

## False Representations – 2000

25. For the 2000 crop year, the WARRENS obtained federal crop insurance for strawberries, as well as for tomatoes. With regard to the strawberries, the policies were for a farm in Buncombe County and a farm in Henderson County, North Carolina. On or about June 22, 2000, WARREN FARMS submitted to E.L. Ross a "Proof of Loss" form and a "Production Worksheet" showing a total harvest of 4,375 buckets from these two farms. These forms contained the signatures of ROBERT WARREN and JEFFERY MARSH. MARSH also prepared and signed an Adjuster's Special Report dated June 22, 2000, stating that the crop was inspected with the agent, and reporting "no marketable value upon inspection."

26. In support of their strawberry loss claim, the WARRENS submitted two Strawberry Appraisal Worksheets to E.L. Ross, reporting harvests on these farms between April 29 and May 13. Both worksheets were originally dated June 22, 2000 but then whited out and altered to read May 17, 2000. Both worksheets contained MARSH's signature.

27. In fact, however, the WARRENS did not suffer a payable loss in their 2000 strawberry production, and they fraudulently under-reported production in order to obtain indemnity payments. Whereas they reported that total production of strawberries had been 4,375 buckets, with no harvests after May 13, 2000, they actually had harvested more than 48,000 buckets of strawberries, with harvests continuing into early June 2000. These false representations by the WARRENS and MARSH resulted in the receipt of $98,037 in indemnity payments.

28. With regard to their tomato farming operation in 2000, the WARRENS also fraudulently overstated the acreage for their Spartanburg County farm, FSN 2336. The number of acres planted is an essential factor in determining the production off of a particular farm, since the insurance is

10

CaSa1e0B:0B-00000-76RMBL-BLH DDcauerent3-3 FiFelecd0/0B/B/B3 PaPage10 1044 44

based upon a set guaranteed yield *per acre*. For a given production off of a given farm, the larger the number of acres that farm has, therefore, the lower the yield *per acre* will be.

a) Knowing this, the WARRENS, through KISER, submitted an "MPCI Application and Reporting Form, Acreage Report" in May 2000 for FSN 2336, with the planted acreage listed as 120.5 acres. However, during the 2000 growing season, the insurance company's loss adjusters measured the acreage while conducting a field inspection of FSN 2336 and determined its actual acreage to be 80.95.

b) The WARRENS contested this determination of the acreage on that farm, conceding that their previous claim of 120.5 acres had been too high, but now claiming that the correct acreage was 92.4 acres. In support of this newly claimed acreage figure, ROBERT WARREN submitted a signed and notarized letter from a surveyor stating that the farm had been surveyed and that it was 92.4 acres. That letter and the surveyor's signature were both forgeries, created by a WARREN FARMS employee at the direction of the WARRENS.

c) The WARRENS received $478,864 based on this loss claim concerning FSN 2336.

29. Additionally, the WARRENS claimed that 14 of their 26 farms had losses and that the total harvest from these 14 farms was only an average of 196.9 boxes per acre. They claimed that the other 12 farms produced an average of 3,438 boxes per acre. In fact, the WARRENS had kept no records breaking down the tomato yield by farm. Rather, the WARRENS simply allocated the total tomato production for 2000 among the various insured fields. In addition, the WARRENS under-reported total production of tomatoes for 2000. Rather than the 589,929.8 boxes they reported, the actual total production was more than 1,000,000 boxes.

11

30. In total, the WARRENS received approximately $2,254,883 (partly in the form of credits against premium payments) as a result of these and other false claims for crop insurance for the 2000 growing season for tomatoes.

*False Representations – 2001*

31. In 2001, the WARRENS changed their crop insurance carrier to Fireman's Fund AgriBusiness ("Fireman's Fund"), a wholly-owned subsidiary of Fireman's Fund Insurance Company, which also had a reinsurance agreement with the FCIC. In addition to applying for coverage for tomato farms in North Carolina and South Carolina, the WARRENS also applied for tomato crop insurance for a farm, FSN 1205, in Cocke County, Tennessee. They had not raised tomatoes on FSN 1205 prior to that crop year. Nevertheless, WARREN FARMS submitted false reports to Fireman's Fund and RMA in February and March 2001 claiming one year's history of tomato production, for 2000, from FSN 1205. Then, in May 2001, the WARRENS submitted another report to Fireman's Fund claiming ten years of production history from FSN 1205, for 1991 through 2000. On June 25 2001, the WARRENS submitted to Fireman's Fund additional false records supposedly showing tomato yields from FSN 1205 for 1991 through 2000.

32. The WARRENS later created even more false supporting documents when asked by Fireman's Fund in November 2001 to substantiate their previous false representations. These false documents were submitted to Fireman's Fund and RMA on or about December 3, 2001. These false documents included:

a) ten statements signed by JAIMES (one each for the years 1991 through 2000) falsely claiming that WARREN FARMS grew tomatoes on that farm for those years;

12

Case 3:03-cr-00076-RM-BLH Document 3-3 Filed 10/08/03 Page 12 of 44

b) a notarized letter from a WARREN FARMS employee falsely claiming to have leased this land to WARREN FARMS during 1991 to 1999, and nine false lease agreements between the employee and WARREN FARMS to cover each of those years;

c) a false representation by a realtor that the WARRENS had grown tomatoes on that farm from 1991 to 2001;

d) false planting schedules for each of the years 1991 to 2000;

e) false spraying records for these years, prepared by DEAN COLE at the instruction of the WARRENS;

f) false representations and a false drawing concerning the irrigation system allegedly installed on the farm in 2000 and the layout of the tomato plants on the farm that year; and

g) hundreds of pages of fabricated invoices, manifests, and harvesting records concerning FSN 1205 for the years 1991 through 2000.

33. Additionally in 2001, the WARRENS created fraudulent records and staged false weather disasters in an effort to show losses and replanting expenses on FSN 1205. For instance, the WARRENS certified to Fireman's Fund that they had completed planting all 252.5 acres of FSN 1205 by June 25, 2001, when actually they had only planted a few acres. Then, in early July 2001, the WARRENS directed employees to buy bags of ice cubes and scatter them around the few acres of tomato plants, which they ultimately beat down with sticks or other implements. The employees also threw ice cubes into the air while other employees took pictures to support the claim of a hail storm. The WARRENS also had mothballs spread out among the plants and had pictures taken of this, again to create false supporting evidence of a hail storm.

13

Case 1:03-cr-00076-RMB-BLH Document 3-3 Filed 10/08/03 Page 13 of 44

34. To support their fraudulent claim for reimbursement for the expenses of "replanting" the entire farm necessitated by this supposed hail storm, the WARRENS submitted to Fireman's Fund numerous false documents, including:

a) Several documents entitled "Mountain Top Farms Planting Manifests," supposedly showing the delivery and receipt at FSN 1205 of numerous shipments of tomato plants for both the initial planting and the replanting of the entire farm.

b) A letter on the letterhead of First Step Farms confirming the sale of 406,200 tomato plants to WARREN FARMS. That letter was a forgery, prepared by an employee of WARREN FARMS at the direction of ROBERT WARREN.

c) A letter from Pacific Tomato Growers, confirming a sale of 660,000 tomato plants. This letter was also a forgery, prepared by a WARREN FARMS employee at the direction of ROBERT WARREN.

35. As a result of this fraud, the WARRENS falsely claimed $98,490 in expenses for replanting 252.5 acres on FSN 1205.

36. The WARRENS also falsely under-reported the production off of FSN 1205. At the end of the growing season, they claimed to have harvested only 16,766 boxes of tomatoes from FSN 1205 in 2001, making them eligible for $2,718,125 in payments in crop losses from this farm. In truth and fact, however, approximately 67,714 boxes were harvested from FSN 1205.

37. The WARRENS also made a fraudulent replant claim against Fireman's Fund for their five South Carolina Farms in 2001. They claimed that a freeze had destroyed the entire crop on all five of these farms, necessitating a replant, and submitted various forms and worksheets to Fireman's Fund to justify their claimed expenses. In fact, however, all of these statements to FIREMAN'S

14

FUND were fraudulent. Those farms had not actually suffered the extensive damage claimed by the WARRENS, nor had the WARRENS incurred the expenses of replanting as claimed.

38. In furtherance of this deception, however, the WARRENS submitted numerous false documents to Fireman's Fund, showing the supposed costs of replanting and the replanting dates, labor costs, and the cost of plants. Included in these documents were the following fraudulent records, among others:

a) Five documents entitled "Mountain Top Farms Planting Manifests," signed by JAIMES, showing 1,182,763 tomato plants delivered to WARREN FARMS for the replanting.

b) A letter from Pacific Tomato Growers, confirming a sale of 228,000 tomato plants to WARREN FARMS, for the purpose of replanting damaged fields. This letter was a forgery, created by an employee of WARREN FARMS at the direction of ROBERT WARREN.

39. Fireman's Fund relied on the false information provided by the WARRENS to calculate the amount of the replant payment for the South Carolina farms, determining in August 2001 that the WARRENS were entitled to a replant payment of $63,761.25 for the South Carolina farms.

40. The WARRENS also made false statements to Fireman's Fund and RMA in their applications for insurance indemnities from Fireman's Fund for 2001 for farms in Laurens, Spartanburg, Buncombe, and Henderson Counties. As in previous years with E.L. Ross and Rain & Hail, the WARRENS falsely reported to Fireman's Fund the production from these farms in order to obtain insurance indemnity payments to which they were not entitled. The WARRENS claimed losses on 17 of their farms in North and South Carolina and Tennessee, amounting to a total of 746.3 acres with an average yield of 81.3 boxes per acre. They reported that 13 farms in North Carolina suffered no losses, for a total acreage of 270 acres and an average yield of 2,591 boxes per acre.

15

CaSeasle0B-0B-000706-T6RVIBL-BLH DDocuumerent-3-3  FiFeed1d10/038/808/303 PaPeage15 15 44 44

These figures were false, however, since, as in previous years, WARRENS FARMS and its employees and officers kept no accurate records identifying the particular fields from which its tomatoes were picked.

41. In addition, the total 2001 tomato production for the WARRENS' North Carolina and South Carolina farms was under-reported to Fireman's Fund and to RMA. The WARRENS reported a total harvest of 760,417 boxes of tomatoes, when the actual harvest was more than 1,000,000 boxes.

42. As a result of the various losses claimed by the WARRENS for 2001, Fireman's Fund paid them a total of $1,097,718 in indemnities and credits against premiums. In addition, payment from Fireman's Fund on an additional $3,805,610 in indemnities claimed by the WARRENS, including $2,718,125 which they claimed they were owed from losses on Tennessee FSN 1205, is still pending. The WARRENS are still, as of the time of this indictment, fraudulently attempting to obtain that money from Fireman's Fund through formal arbitration proceedings.

### *False Representations – 2002*

43. For the 2002 crop year, the WARRENS and KISER planned to change insurance carriers from Fireman's Fund to IGF Insurance Company ("IGF"), another company represented by KISER that had a reinsurance agreement with the FCIC. In an effort to defraud IGF and the FCIC, the WARRENS and KISER, with others known and unknown to the Grand Jury, developed and began to execute a plan to have much of the WARRENS' property falsely appear to be farmed by other "front producers," who could obtain insurance at a lower rate, and whose future loss claims might not arouse suspicion or be scrutinized as closely as those submitted by the WARRENS.

16

44. In furtherance of this plan, on or about June 6, 2001, ROBERT WARREN and KISER signed an agreement designating KISER as the WARREN FARMS crop insurance agent of record for the 2002 growing season. On or about that same day, KISER wrote a strategy memorandum to WARREN FARMS, outlining a plan to request tomato policies in certain counties in North and South Carolina, but emphasizing that the request should be in the name of a producer other than WARREN FARMS. KISER specifically suggested the use of "front producers" to apply for the insurance, and stressed the importance of hiding the involvement of WARREN FARMS from the USDA. KISER also suggested using IGF rather than Fireman's Fund, noting that this would also keep the USDA "from suspecting any connection of the request with R & V Warren."

45. To carry out the scheme set out in KISER's memorandum, on or about June 29, 2001, KISER submitted to IGF two packets of completed forms for purposes of obtaining coverage in the name of "A.S." (a person whose identity is known to the Grand Jury), T/A Sandoval Farms, in Spartanburg and Greenville Counties, South Carolina and Henderson and Buncombe Counties, North Carolina. KISER also submitted production histories for Sandoval Farms for most of these farms. All of these documents were signed by KISER and bore a signature purported to be A.S.'s.

46. Attached to each of the packets was a letter from KISER addressed to RMA in which KISER asserted that, "Mr. [A.S.] has been a producer of vine ripen tomatoes ... for several years."

47. IGF sent these documents on to RMA, which received them on or about July 2, 2001. RMA returned these applications, noting that they were too late for the 2001 crop year and too early for the 2002 crop year.

48. These applications and their supporting documentation were fraudulent. A.S. was the crew chief of the pickers used by the WARRENS. He had not raised tomatoes as described in the

17

Case 1:03-cr-00076-RM-BLH Document 3-3 Filed 10/08/03 Page 17 of 44

crop histories provided by KISER to IGF and RMA. Moreover, his purported signatures on these applications were forgeries, and he did not give anyone permission to sign his name, nor did he know that KISER was applying for insurance coverage in his name.

49. The information that KISER had put on the applications concerning the county, year, FSN, acres, total boxes, and total boxes per acre for these farms was all provided to him by the WARRENS for purposes of assisting in getting insurance coverage in the name of a "front producer."

50. In a further effort to obtain insurance from IGF in the name of a "front producer," ROBERT WARREN called an insurance agent in Tennessee asking for help in obtaining crop insurance for some friends, including A.S., as well as two other persons known to the Grand Jury. WARREN told the agent that all these "friends" had four years of good production history and arranged a meeting between the agent and A.S. At that meeting, A.S. gave the agent a folder containing handwritten notes showing the FSNs, years, acres, production, and yields for several fields, all provided to him by ROBERT WARREN for this purpose, and all false. WARREN called the agent after the meeting and asked if the agent could help his friends. The agent told WARREN that he could not because he was not licensed to sell insurance in North Carolina. He suggested that WARREN send his friends to KISER.

51. ROBERT WARREN then asked A.S. to sign a Crop Insurance Application, Cancellation Change and Transfer Form for IGF dated March 8, 2002. This signed form was then faxed to KISER for him to forward it on to IGF. The application requested insurance in Henderson and Haywood Counties for five farms, with two of the five farms having four years of good production history. These production histories were fictitious.

18

Case 1:03-cr-00006-RMB-BLH Document 3-3 Filed 10/08/03 Page 18 of 44

52. In addition, the other two "friends" that ROBERT WARREN had told the Tennessee agent needed insurance also completed applications for crop insurance. These two persons, using the name of Big Creek Farms, provided fictitious tomato production histories on an application which was also sent to KISER in March 2002 for him to submit to IGF.

53. Before KISER submitted the front producer insurance applications to IGF, however, federal law enforcement agents executed search warrants at the home of the WARRENS, as well as the Candler and Mills River pack houses on March 12, 2002. That same day, a WARREN FARMS employee telephoned KISER, told him of the search warrants, and told him not to submit the crop insurance application for Sandoval Farms or Big Creek Farms. KISER told the employee that he would burn them in the barrel behind his office.

### The Scheme to Defraud Patten Seed Company

54. The crop insurance companies and the FCIC were not the only entities that the WARRENS attempted to defraud by using false records of their 1998, 1999, and 2000 tomato production. From 1999 through 2002, the WARRENS used the same type of false picking records, payroll records, invoices, manifests, and other documents concerning most of these same farms in an attempt to defraud a neighbor in the Mills River area of more than $600,000. These false records, purporting to be from the same farms for three of the same years as the records produced to the insurance companies, are inconsistent with and contradict the records provided to those companies.

55. On or about September 8, 2000, the WARRENS initiated a lawsuit against the Patten Seed Company ("Patten Seed"), alleging that on or about May 28, 1999, an employee of Super Sod, a division of Patten Seed, negligently sprayed an herbicide on land owned by Super Sod near the WARRENS' tomato fields in the Mills River area, and that the herbicide also leaked from its tank,

19

Case 1:03-cr-00076-RV-BL-H Document 3 Filed 01/08/03 Page 19 of 44

causing severe damage to the tomato plants on several of the WARRENS' fields. Ultimately, the WARRENS asserted that the spraying and leak caused over $600,000 in damages.

56. During that lawsuit, the WARRENS and Patten Seed engaged in extensive discovery proceedings, with the WARRENS producing large numbers of documents to Patten Seed purporting to show, among other things, the production of tomatoes from many of the WARRENS' farms in 1998, 1999, and 2000. These documents, as well as the formal answers provided by the WARRENS to interrogatories and document requests filed by Patten Seed, were materially false and fraudulent.

57. Prior to filing the complaint, the WARRENS attempted to obtain a monetary settlement with Patten Seed. In a letter sent through the United States Postal Service ("Postal Service") to the insurance carrier for Patten Seed, mailed to an address in Charlotte, within the Western District of North Carolina, on or about May 22, 2000, the WARRENS' attorney stated that WARREN FARMS was willing to accept $627,232 as a settlement for the damages incurred. Included with the letter were "reports and other data, including production records and sales records" related to the WARRENS' tomato fields. These documents produced by the WARRENS to Patten Seed, purporting to show picking records from various farms, were false.

58. The WARRENS frequently used the Postal Service to comply with Patten Seeds' discovery requests and to provide additional false documents to Patten Seed. For example, the WARRENS served their "Supplemental Response to Defendant's Second Request for Production of Documents" via the Postal Service on or about March 23, 2001. In that response, the WARRENS falsely stated that, while they did "not maintain separate sales records for separated fields" of tomatoes, they did "maintain records for production yields for particular fields."

Case 3:03-cr-00076-RMB-BLH Document 3-3 Filed 10/08/03 Page 20 of 44

59. The WARRENS also served their "Supplemental Response to Defendant's First Set of Interrogatories, First Request for Production, and Third Request for Production" via the Postal Service on or about June 26, 2001. As part of that response, the WARRENS stated that they provided Patten Seed with documentary evidence of the income they earned from 1994 through 2000 on the tomato fields affected by the herbicide leak.

60. On or about February 25, 2002, the WARRENS served their response to another request for production of documents via the Postal Service. In that response, the WARRENS provided figures purporting to show yields for their tomato fields for 1999. These supposed yields differ substantially from the yields the WARRENS reported to E.L. Ross at the end of 1999. As one example, in this discovery answer the WARRENS stated that their yield for the "Goat Field" was 2,215 cartons per acre in 1999. The yield that the WARRENS had reported to E.L. Ross for that same year and field was only 62.92 cartons per acre.

61. As another example, the WARRENS also produced documents entitled "NC-1998," "NC-1999," and "NC-2000" to Patten Seed. Once again, the production numbers contained within these documents differed drastically from the production numbers provided to the WARRENS' crop insurance carriers for the same years. For example, the "NC-1999" chart shows that the "total boxes" of tomatoes produced by the WARRENS in North Carolina in 1999 was 865,997. According to the information provided to E.L. Ross that same year, however, the WARRENS produced only 316,799 cartons of tomatoes on their North Carolina fields.

62. On May 3, 2002, after the federal search warrants had been executed and the affidavit in support of those warrants was unsealed and became public, the WARRENS filed a "Notice of

21

Voluntary Dismissal" with respect to their civil action and asked for dismissal of their case with prejudice. That motion was granted.

## COUNT ONE (CONSPIRACY)

63. Paragraphs 1 through 62 are realleged and incorporated by reference herein.

64. From in or about January 1997 and continuing until the present, in Buncombe and Henderson Counties, within the Western District of North Carolina, and elsewhere, the defendants

ROBERT WARREN,
VIKI WARREN,
R & V WARREN FARMS, INC.,
GEORGE T. KISER,
DEMETRIO JAIMES,
HAROLD DEAN COLE,
and
THOMAS JEFFREY MARSH,

knowingly and willfully combined, conspired, confederated and agreed with one another, and with other persons known and unknown to the Grand Jury, to commit certain offenses against the United States, namely:

(a) knowingly making a false statement and report for the purpose of influencing the action of the FCIC and a company the FCIC reinsures upon an application, advance, and commitment, in violation of Title 18, United States Code, Section 1014;

(b) being an agent of and connected in any capacity with the FCIC, knowingly making a false entry in a book, report, and statement to the FCIC with the intent to defraud the FCIC and any officer, auditor, examiner, and agent of the FCIC; and, knowingly and with the intent to defraud the FCIC, participating, sharing in, and receiving, directly and indirectly, money, profit, and benefits

22

through a transaction, commission, and other act of the FCIC, in violation of Title 18, United States Code, Section 1006.

## *Manner and Means*

65. The manner and means used in this conspiracy included the creation of false records, invoices, payroll accounts, shipping manifests, certifications, and other documents by the defendants. These documents were then submitted to the FCIC and to companies reinsured by the FCIC in order to fraudulently obtain crop insurance coverage, to fraudulently inflate the guaranteed yield figures of the insurance policies, to fraudulently obtain payments for false replantings, and to fraudulently obtain indemnity payments based upon under-reported and mis-allocated production figures.

## *Overt Acts*

66. In furtherance of the conspiracy and to effect the objects thereof, the defendants committed and caused to be committed, in Buncombe and Henderson Counties within the Western District of North Carolina and elsewhere, the overt acts as set forth in Paragraphs 13 through 53 of this indictment, and as set forth in Counts Two through Twenty-Three of this indictment, which are incorporated herein by reference.

All in violation of Title 18, United States Code, Section 371.

## COUNTS TWO THROUGH TWENTY-THREE (FALSE STATEMENTS)

67. Paragraphs 1 through 62 of this indictment are realleged and incorporated herein by reference.

68. On or about the dates listed below, in Buncombe County and Henderson County, within the Western District of North Carolina, and elsewhere, the defendants listed below, and others known to the Grand Jury, knowingly made material false statements and reports to the Federal Crop

23

Case 1:03-cr-00076-RMB-LH Document 3-3 Filed 10/08/03 Page 23 of 44

Insurance Corporation and to companies that the Federal Crop Insurance Corporation reinsures, for the purpose of influencing the action of the Federal Crop Insurance Corporation and of such reinsured companies upon an application, advance, and commitment, and did aid and abet one another in the making of such material false statements and reports:

| COUNT | DATE | DEFENDANTS | FALSE STATEMENT | AS MORE FULLY SET FORTH IN PARAGRAPH: |
|---|---|---|---|---|
| 2 | 2/12/97 | ROBERT WARREN, VIKI WARREN, and WARREN FARMS | Production and Yield Reports with four years of production history on three farms in Buncombe County and four farms in Henderson County | 13, 14 |
| 3 | 6/2/97 | ROBERT WARREN, VIKI WARREN, and WARREN FARMS | MPCI Application and Reporting Form, Acreage Report, stating Spartanburg Farm FSN 2336 had been planted on April 15, 1997 | 15 |
| 4 | 8/16/97 | ROBERT WARREN, VIKI WARREN, and WARREN FARMS | Proof of Loss Form and Production Worksheet for Spartanburg Farm FSN 2336 | 16 |
| 5 | 5/15/98 | ROBERT WARREN, VIKI WARREN, WARREN FARMS, and GEORGE T. KISER | MPCI Application and Reporting Form, Acreage Report, stating that FSN 2336 and FSN 3049 in South Carolina were planted on April 26, 1998 | 18 |

24

Case 1:03-cr-00076-RMB-BLH Document 3-3 Filed 10/08/03 Page 24 of 44

| COUNT | DATE | DEFENDANTS | FALSE STATEMENT | AS MORE FULLY SET FORTH IN PARAGRAPH: |
|---|---|---|---|---|
| 6 | 9/29/98 and 10/20/98 | ROBERT WARREN, VIKI WARREN, and WARREN FARMS | Proof of Loss Forms and Production Worksheets reporting total harvest from FSN 3342, 3499,3574, 3577, and 6341 | 19 |
| 7 | 8/12/99 | ROBERT WARREN, VIKI WARREN, and WARREN FARMS | Proof of Loss Form and Production Worksheet reporting total harvest figures from FSN 3049 and 3663 | 21 |
| 8 | 9/20/99 - 11/12/99 | ROBERT WARREN, VIKI WARREN, and WARREN FARMS | Proof of Loss Forms and Production Worksheets reporting total harvest figures from FSN 3574, 140, 9319, 3569, 3577, 3584, 3637, 193, 473, 1141, 3499, 933, 3017, 3529, 9350, and 3578 | 23 |
| 9 | 6/22/00 | ROBERT WARREN, VIKI WARREN, WARREN FARMS, and THOMAS JEFFREY MARSH | Proof of Loss Forms and Production Worksheets reporting total strawberry production of 4,375 buckets, and Strawberry Appraisal Worksheets reporting no production to count, and false completion date of May 17, 2000 | 25, 26, 27 |
| 10 | 8/28/00 | ROBERT WARREN, VIKI WARREN, and WARREN FARMS | Proof of Loss Form and Production Worksheet reporting total harvest figures from FSN 2336 | 28,29 |

Case 1:03-cr-00076-RV-BLH Document 3-3 Filed 10/08/03 Page 25 of 44

| COUNT | DATE | DEFENDANTS | FALSE STATEMENT | AS MORE FULLY SET FORTH IN PARAGRAPH: |
|---|---|---|---|---|
| 11 | 9/20/00 | ROBERT WARREN, VIKI WARREN, and WARREN FARMS | Letter dated 8/28/00 from a surveyor, stating he had surveyed FSN 2336 on 8/15/00, had determined acreage, and had signed the letter | 28 |
| 12 | 11/21/00 | ROBERT WARREN, VIKI WARREN, and WARREN FARMS | Proof of Loss Forms and Production Worksheets reporting total harvest figures from FSN 933, 17, 193, 496, 685, 3017, 3529, 3574, 3577, 3637, 3645, 3880, and 3886 | 29 |
| 13 | 5/18/01 | ROBERT WARREN, VIKI WARREN, and WARREN FARMS | Production and Yield Report showing tomato production figures from FSN 1205 from 1991 through 2000 | 31 |
| 14 | 8/24/01 | ROBERT WARREN, VIKI WARREN, and WARREN FARMS | Proof of Loss Form and Production Worksheet stating that hail destroyed 252.5 acres of tomatoes on FSN 1205 | 33,34,35 |
| 15 | 8/24/01 | ROBERT WARREN, VIKI WARREN, and WARREN FARMS | Letter Dated 7/14/01 from First Step Farms reflecting sale to WARREN FARMS of 406,200 plants for $24,372 | 34 |

Case 1:03-cr-00076-RM-BLH Document 3-3 Filed 10/08/03 Page 26 of 44

| COUNT | DATE | DEFENDANTS | FALSE STATEMENT | AS MORE FULLY SET FORTH IN PARAGRAPH: |
|---|---|---|---|---|
| 16 | 8/24/01 | ROBERT WARREN, VIKI WARREN, and WARREN FARMS | Letter Dated 7/13/01 from Pacific Tomato Growers ("PTG") stating that PTG sold WARREN FARMS 660,000 plants for $39,600, and that the letter was signed by the vice president of PTG | 34 |
| 17 | 8/24/01 | ROBERT WARREN, VIKI WARREN, and WARREN FARMS | MPCI Replant Worksheets, Proof of Loss Forms, and Certification Forms stating that WARREN FARMS replanted the entire acreage on the five South Carolina farms between 4/19/01 and 4/23/01 | 37 |
| 18 | 8/24/01 | ROBERT WARREN, VIKI WARREN, and WARREN FARMS | Letter dated 4/24/01 from PTG stating that PTG sold WARREN FARMS 228,000 plants for replanting the South Carolina farms, and that the letter was signed by the vice president of PTG | 38 |
| 19 | 8/28/01 | ROBERT WARREN, VIKI WARREN, and WARREN FARMS | Proof of Loss Forms, Production Worksheet Forms, and MPCI Non-Waiver Agreements showing total harvest figures for FSN 3049, 3663, 2336, 2309, and 5001 in South Carolina | 40, 41 |
| 20 | 10/15/01 | ROBERT WARREN, VIKI WARREN, and WARREN FARMS | Production Worksheet Form showing total harvest figures for FSN 193, 556, 685, 3154, 3159, 3529, 3579, 3640, 3641, 3645, 3880, and 3941 | 40, 41 |

27

Case 1:03-cr-00076-RM-BLH Document 3-3 Filed 10/08/03 Page 27 of 44

| COUNT | DATE | DEFENDANTS | FALSE STATEMENT | AS MORE FULLY SET FORTH IN PARAGRAPH: |
|---|---|---|---|---|
| 21 | 12/3/01 | ROBERT WARREN, VIKI WARREN, WARREN FARMS, and DEMETRIO JAIMES | Ten statements signed by JAIMES that WARREN FARMS grew tomatoes on FSN 1205 in 1991 through 2000 | 32 |
| 22 | 12/3/01 | ROBERT WARREN, VIKI WARREN, and WARREN FARMS | Notarized letter and nine lease agreements stating that WARREN FARMS leased land in Tennessee from the signer of these documents from 1991 through 1999, and grew tomatoes on FSN 1205 during those years | 32 |
| 23 | 12/3/01 | ROBERT WARREN, VIKI WARREN, WARREN FARMS, and HAROLD DEAN COLE | Spraying records, prepared by COLE, purporting to show the spraying schedules for tomatoes grown on FSN 1205 from 1991 through 2000 | 32 |

All in violation of Title 18, United States Code, Sections 1014 and 2.

## COUNT TWENTY-FOUR (CONTINUING FINANCIAL CRIMES ENTERPRISE)

69. Paragraphs 1 through 62 are realleged and incorporated by reference herein.

70. From on or about October 9, 1998, through on or about December 3, 2001, in Buncombe County and Henderson County, within the Western District of North Carolina, and elsewhere, the defendant,

28

Case 1:03-cr-00076-RM-BLH Document 3-3 Filed 10/08/03 Page 28 of 44

ROBERT WARREN,

organized, managed, and supervised a continuing financial crimes enterprise, in that the defendant did commit a series of violations of Title 18, United States Code, Section 1014, as alleged in Counts Two through Twenty-Three of this indictment and which are incorporated herein, which violations were committed by at least four persons acting in concert, and from which continuing series of violations the defendant received more than $5,000,000 in gross receipts during a 24-month period, that is, from on or about October 11, 1999 through on or about October 10, 2001.

All in violation of Title 18, United States Code, Section 225.

## COUNTS TWENTY-FIVE THROUGH TWENTY-NINE (MAIL FRAUD)

71. Paragraphs 1 through 62 of this indictment are realleged and incorporated herein by reference.

72. On or about the dates set forth below, in Buncombe County, Henderson County, and Mecklenburg County, within the Western District of North Carolina, and elsewhere, the defendants,

ROBERT WARREN<br>and<br>VIKI WARREN,

and others known and unknown to the Grand Jury, aiding and abetting one another, having devised a scheme and artifice to defraud Patten Seed Company, and for purposes of obtaining money and property from this person by means of false and fraudulent pretenses and representations, and for purposes of attempting so to do, did knowingly cause to be delivered by the United States Postal Service and by private and commercial interstate carriers, according to the directions thereon, certain matters or things, to attorneys representing Patten Seed Company and its insurance carrier, at addresses in Buncombe County and Mecklenburg County:

29

| COUNT | DATE | DOCUMENT MAILED |
|---|---|---|
| 25 | 5/22/00 | Letter Seeking $627,232 as Settlement of Claim |
| 26 | 3/23/01 | Supplemental Response to Defendant's Second Request for Production of Documents |
| 27 | 5/21/01 | Response to Defendant's Fourth Request for Production |
| 28 | 6/29/01 | Response to Defendant's Third Set of Interrogatories |
| 29 | 2/25/02 | Response to Carlands' First Request for Production of Documents |

All in violation of Title 18, United States Code, Sections 1341 and 2.

## COUNT THIRTY (PERJURY)

73. Paragraphs 1 through 62 are realleged and incorporated herein by reference.

74. On or about February 10, 2003, in Buncombe County, within the Western District of North Carolina, the defendant,

DEMETRIO JAIMES,

while under oath and testifying in a proceeding before a Grand Jury of the United States sitting in the Western District of North Carolina, did knowingly make a false material declaration, to wit:

75. At the time and place aforesaid, the Grand Jury was conducting an investigation to determine whether violations of Title 18, United States Code, Sections 1014 (false statements to the Federal Crop Insurance Corporation), 1341 (mail fraud), 371 (conspiracy), and 1956 (money laundering), among others, had been committed, and to identify the persons who had committed, caused the commission of, and conspired to commit such violations. That investigation by that Grand Jury has resulted in this indictment. It was material to the said investigation that the Grand Jury ascertain whether the WARRENS had, in fact planted tomatoes on the entire 252.5 acres of FSN 1205 in Cocke County, Tennessee by June 30, 2001, whether those acres of tomatoes had been

30

CaSaSaeOB:OB-OOOOO-T6RVBL-BLH DDocument3-3 FiFiled10/08/8/03 PaPage30 30 44 44

damaged by a hail storm in early July 2001, and whether there had actually been a replant of all 252.5 acres on that farm.

76. At the time and place alleged, the defendant, DEMETRIO JAIMES, appearing as a witness under oath at a proceeding before the Grand Jury, knowingly made the following declarations in response to questions concerning the purported hail storm and replanting on FSN 1205:

Q. Do you remember there was a replant in Tennessee in 2001?

A. Yes. Yes, we replanted.

Q. How much of the farm had been planted before the hail that caused the damage for the replant?

A. Again, can you repeat that?

Q. Yes, before the hail – the hail hit July 4th of 2001 – before the hail storm, how much of the farm had been planted?

A. *We would replant everything, the whole farm, at least that, to be sure. That's what the Warrens told me. It was to be sure we would have the best plants possible.*

Q. Before the replant, had you planted the entire farm before the hail storm?

A. *Yes. We did that eight days after we put the plants in the field.*

\* \* \*

Q. So your testimony is, when the hail hit, the entire farm had already been planted with tomatoes?

31

CaSase03:03-00070-76RMDL-BLH DDcoumenent3-3 FiFeld01/08/803 Papage31 44 44

A.   *Yes.*

77. The aforesaid italicized testimony of DEMETRIO JAIMES, as he then and there well knew and believed, was false in that only a small portion of FSN 1205, approximately 10 acres or less, had been planted before the supposed replant. As JAIMES also well knew, there had not been a hail storm that had damaged the entire farm of tomatoes. Rather, he and others had whipped the plants on the few acres that had been planted, in order to make it appear they had been damaged by hail.

All in violation of Title 18, United States Code, Section 1623.

### COUNT THIRTY-ONE (OBSTRUCTION OF JUSTICE)

78. Paragraphs 1 through 62 are realleged and incorporated herein by reference.

79. On or about February 10, 2003, in Buncombe County, within the Western District of North Carolina, the defendant,

DEMETRIO JAIMES,

did corruptly influence, obstruct, and impede, and did corruptly endeavor to influence, obstruct, and impede the due administration of justice by a Grand Jury of the United States sitting in the Western District of North Carolina by deliberately making false statements, as set forth in more detail in Count Thirty, which is incorporated herein by reference.

All in violation of Title 18, United States Code, Section 1503.

### COUNT THIRTY-TWO (PERJURY)

80. Paragraphs 1 through 62 are realleged and incorporated herein by reference.

81. On or about April 30, 2003, in Buncombe County, within the Western District of North Carolina, the defendant,

32

Case 1:03-cr-00070-RMB-BLH  Document 8-3  Filed 10/08/03  Page 32 of 44

HAROLD DEAN COLE,

while under oath and testifying in a proceeding before a Grand Jury of the United States sitting in the Western District of North Carolina, did knowingly make a false material declaration, to wit:

82. At the time and place aforesaid, the Grand Jury was conducting an investigation to determine whether violations of Title 18, United States Code, Sections1014 (false statements to the Federal Crop Insurance Corporation), 1341 (mail fraud), 371 (conspiracy), and 1956 (money laundering), among others, had been committed, and to identify the persons who had committed, caused the commission of, and conspired to commit such violations. That investigation by that Grand Jury has resulted in this indictment. It was material to the said investigation that the Grand Jury ascertain whether the WARRENS had in fact raised tomatoes on FSN 1205 in Cocke County, Tennessee, in the years 1991 through 2000. As part of that investigation, the Grand Jury was considering a set of ten spraying records, one each for the years 1991 through 2000, purportedly relating to that farm, which the WARRENS had submitted to Fireman's Fund and the FCIC in December 2001 in support of the claim that the WARRENS had raised tomatoes on that farm during those years.

83. At the time and place alleged, the defendant, HAROLD DEAN COLE, appearing as a witness under oath at a proceeding before the Grand Jury, knowingly made the following declarations in response to questions concerning these purported spraying records (which were identified as Grand Jury Exhibits 27 through 36):

Q.     Exhibits 27 through 36, you told us that was in your handwriting, correct?

A.     Yes.

33

CaSasae03-03-00070-76RVDL-BLH DDocument3-3   Fifiled10/08/8/03 PaPagg3 33 44 44

Q. All right. Tell us, if you would, how was it that those documents came to – why was it that you prepared those? Who asked you to do that?

A. Mr. and Mrs. Warren, they were going to set the fields in Tennessee in tomatoes. I think there were 250 acres, the best of my – I can't – I can't remember exactly how many acres. They said they – *they had some old records and they said they were unreadable and they wanted to know if I'd go back through them, recopy them, because they had to have them readable for the insurance company so they could purchase the insurance for Tennessee*, because they couldn't afford to put that many acres of tomatoes in without insurance.

\* \* \*

Q. Now, the documents they showed you that you then used that information to come up with the exhibits that are in front of you, was it 27 through 36?

A. I believe so.

Q. Did you have any idea whether those documents themselves, those underlying documents, were accurate or not?

A. *No, I have no idea.*

\* \* \*

34

Case 1:03-cv-00076-RM-BLH Document 3-3 Filed 10/08/03 Page 34 of 44

Q.    [Regarding Exhibits 38, a single page document] It lists the year, '91 through 2000, the number of acres, the plant date, the first picking and the last picking.  Do you remember seeing that?

A.    I remember seeing it the last time, but *I don't remember seeing this when I filled those records out.*

Q.    All right.  So other than us showing it to you before, your testimony is you have never seen Exhibit -- what's now Exhibit 38?

A.    *I don't think I've ever saw this before.*

84.  The aforesaid italicized testimony of HAROLD DEAN COLE, as he then and there well knew and believed, was false in that COLE had not prepared Exhibits 26 through 37 based upon old spraying records.  In fact, as he well knew, he had prepared these documents in or about November 2001, in order for the WARRENS to submit false supporting documentation to Fireman's Fund regarding their history on FSN 1205, and he had not prepared them from old records, but rather from a set of false data that the WARRENS had provided him for that purpose, such as that in Exhibit 38.

All in violation of Title 18, United States Code, Section 1623.

### COUNT THIRTY-THREE (OBSTRUCTION OF JUSTICE)

85.  Paragraphs 1 through 62 are realleged and incorporated herein by reference.

86.  On or about April 30, 2003, in Buncombe County, within the Western District of North Carolina, the defendant,

HAROLD DEAN COLE,

did corruptly influence, obstruct, and impede, and did corruptly endeavor to influence, obstruct, and impede the due administration of justice by a Grand Jury of the United States sitting in the Western

35

Case 1:03-cr-00076-RMB-LH Document 3   Filed 10/08/03 Page 35 of 44

District of North Carolina by deliberately making false statements, as set forth in more detail in Count Thirty-Two, which is incorporated herein by reference.

All in violation of Title 18, United States Code, Section 1503.

## COUNT THIRTY-FOUR (CONSPIRACY TO COMMIT MONEY LAUNDERING)

87. Paragraphs 1 through 62 are realleged and reincorporated herein.

88. Beginning on or about August 29, 1997, and continuing at least through on or about February 11, 2002, in Buncombe County and Henderson County, within the Western District of North Carolina, and elsewhere, the defendants

ROBERT WARREN,
VIKI WARREN
R & V WARREN FARMS, INC.,
and
GEORGE T. KISER,

did combine, conspire, confederate and agree with each other, and with others known and unknown to the Grand Jury, to commit certain offenses against the United States, as follows:

knowingly to engage, attempt to engage, and cause others to engage and attempt to engage in monetary transactions in criminally derived property that was of a value greater than $10,000, and which was derived from specified unlawful activity, in violation of Title 18, United States Code, Section 1957.

All in violation of Title 18, United States Code, Section 1956(h).

## COUNTS THIRTY-FIVE THROUGH FORTY-EIGHT (MONEY LAUNDERING)

89. The introductory paragraphs set forth above in Paragraphs 1 through 62 are realleged and incorporated by reference herein.

36

CaSeas3e03-03-00000G-76RVDL-BLH DDocument3-3 FiFiled10/08/8/03 PaPeage 36 46 41 44

90. On or about the dates set forth below, in Buncombe County and Henderson County, within the Western District of North Carolina, and elsewhere, the defendants

ROBERT WARREN,
VIKI WARREN,
and
R & V WARREN FARMS, INC.,

and others known and unknown to the Grand Jury, did knowingly engage and attempt to engage in the monetary transactions identified below by depositing and transferring funds in excess of $10,000 to and through a financial institution, that is, First Union National Bank ("FUNB"), the deposits of which were then insured by the Federal Deposit Insurance Corporation.

91. The property involved in the transactions was derived from specified unlawful activity, that is, the making of false statements to the Federal Crop Insurance Corporation and companies reinsured by the Federal Crop Insurance Corporation, in violation of Title 18, United States Code, Section 1014, and the defendants knew that the property involved in the transactions was criminally derived.

92. The defendants and others, both known and unknown to the Grand Jury, did aid, abet, command, and induce each other, and willfully cause the commission of said monetary transactions.

| COUNT | DATE | CHECK NO. AND AMOUNT | PAYOR | FINANCIAL TRANSACTION |
|---|---|---|---|---|
| 35 | 10/9/98 | 541671 $294,171 | Insurance Company of North America ("INA)" | Applied to Commercial Loan at FUNB |
| 36 | 10/27/98 | 542321 $663,879 | INA | Applied to Commercial Loan at FUNB |

37

Case 1:03-cr-00076-RVB-BLH Document 3-3 Filed 10/08/03 Page 37 of 44

| COUNT | DATE | CHECK NO. AND AMOUNT | PAYOR | FINANCIAL TRANSACTION |
|---|---|---|---|---|
| 37 | 8/27/99 | 647289 $412,711 | INA | Applied to Commercial Loan at FUNB |
| 38 | 10/19/99 | 648125 $10,238 | INA | Applied to Commercial Loan at FUNB |
| 39 | 11/5/99 | 667621 $1,656,241 | INA | Applied to Commercial Loans at FUNB |
| 40 | 11/22/99 | 668231 $520,132 | INA | Applied to Commercial Loans at FUNB |
| 41 | 12/9/99 | 669040 $816,822 | INA | Applied $692,966.40 to Commercial Loan and deposited $123,855.60 into WARREN FARMS Payroll Account at FUNB |
| 42 | 10/27/00 | 753430 $98,037 | INA | Deposited into WARREN FARMS Payroll Account at FUNB |
| 43 | 11/17/00 | 753708 $130,239 | INA | Applied to Commercial Loan at FUNB |
| 44 | 12/6/00 | 754135 $1,736,344 | INA | Applied to Commercial Loan at FUNB |
| 45 | 10/12/01 | 157743 $25,921 | Fireman's Fund | Deposited into WARREN FARMS Payroll Account at FUNB |
| 46 | 10/12/01 | 157744 $82,063 | Fireman's Fund | Deposited into WARREN FARMS Payroll Account at FUNB |
| 47 | 10/12/01 | 157745 $55,218 | Fireman's Fund | Deposited into WARREN FARMS Payroll Account |
| 48 | 2/11/02 | 685740 $13,946 | INA | Deposited into WARREN FARMS Payroll Account at FUNB |

All in violation of Title 18, United States Code, Sections 1957 and 2.

Case 1:03-cr-00076-RVB-BLH Document 3-3 Filed 10/08/03 Page 38 of 44

## NOTICE OF FORFEITURE AND FINDING OF PROBABLE CAUSE

93. Notice is hereby given of the provisions of 18 U.S.C. § 982 and 28 U.S.C. § 2461(c). Under §2461(c), criminal forfeiture is applicable to any offenses for which forfeiture is authorized by any other statute, including but not limited to 18 U.S.C. § 981 and all specified unlawful activities listed or referenced in 18 U.S.C. § 1956(c)(7), which are incorporated as to proceeds by § 981(a)(1)(C). The defendants

ROBERT WARREN,
VIKI WARREN
R & V WARREN FARMS, INC.,
and
GEORGE T. KISER,

have or had a possessory or legal interest in the following property that is subject to forfeiture in accordance with § 982 and/or § 2461(c):

(a) all property involved in the violations alleged in this bill of indictment;

(b) all property which is proceeds of such violations; and,

(c) in the event that any property described in (a) or (b) cannot be located or recovered or has been substantially diminished in value or has been commingled with other property which cannot be divided without difficulty, all other property of the defendant, to the extent of the value of the property described in (a) and (b).

94. The grand jury finds probable cause to believe that the following property is subject to forfeiture on one or more of the grounds stated above:

(1) All currency and monetary instruments which were received during, involved in or used or intended to be used to facilitate the crimes alleged in this bill of indictment, including but not limited to the following:

39

CaSea1e03-03-000706-76RMBL-BLH DDoouument8-3 FiFele1d0/0/8/8/83 PaPeage9 39 44 44

a) the sum of approximately $9,298,887 in proceeds;

b) the sum of $303,162.29 in United States currency seized by the United States from the following accounts:

| BANK | ACCOUNT NAME | ACCOUNT NUMBER | AMOUNT |
|---|---|---|---|
| First Union | R & V Warren Farms, Inc. | 2075293094034 | $191,684.20 |
| First Union | R & V Warren Farms, Inc. | 2000001217308 | $35,217.19 |
| First Citizens | R & V Warren Farms, Inc., Cattle Division | 001212759803 | $18,641.48 |
| First Citizens | R & V Warren Trucking Co., Inc. | 001212760097 | $44,601.45 |
| Central Carolina Bank | Mountain Top Farms | 0291011989 | $4,772.07 |
| Central Carolina Bank | Warren and Sandoval Farms, Inc. | 0291006159 | $8,245.90 |

c) $599,467.70 in United States currency substituted for real property located at #09A J.D. Hooper Estate, Henderson County, North Carolina, containing approximately 4.49 acres, and found in Henderson County Deed Book 946 Page 485 and the property located on J.D. Hooper Estate, Tracts #09B and #11, Henderson County, North Carolina, containing approximately 11.51 acres, and found in Henderson County Deed Book 970 Page 613.

(2) All title and interest in the following real property, in that such property was involved in the aforestated offenses or is traceable to such property:

a) Property located on Smith Cove Road, Buncombe County, North Carolina, containing approximately 16.99 acres, and found in Buncombe County Deed Book 1775 Page 177.

40

b) Property located at 340 Sardis Road, Buncombe County, North Carolina, containing approximately 1.11 acres, and found in Buncombe County Deed Book 1969 Page 023.

c) Property located at 330 Sardis Road, Buncombe County, North Carolina, containing approximately 2.23 acres, and found in Buncombe County Deed Book 1969 Page 026.

d) Property located on Smith Cove Road, Buncombe County, North Carolina, containing approximately 28.46 acres, and found in Buncombe County Deed Book 2015 Page 427.

e) Property located off of Dave Whitaker Road, Henderson County, North Carolina, containing approximately 19.44 acres, and found in Henderson County Deed Book 966 Page 221.

f) Property located on J.D. Hooper Estate, tracts #4, and #6, in Henderson County, North Carolina, containing approximately 32.44 acres, and found in Henderson County Deed Book 970 Page 613.

g) Property located off of Glady Fork Road, Buncombe County, North Carolina, containing approximately 36.54 acres, and found in Buncombe County Deed Book 2068 Pages 580 and 583.

h) Property located on Black Cove Road, Buncombe County, North Carolina, containing approximately 50 acres and found in Buncombe County Deed Book 1930 Page 223, which was substituted for a Hartford Financial Services Group, Inc., annuity, account number 710473987.

41

Case 1:03-cv-00070-MR-BLH Document 3-3 Filed 10/08/03 Page 41 of 44

i) Property located at 1396 Kilgore Bridge Road, Spartanburg County, South Carolina, containing approximately 113.96 acres, and found in Spartanburg County Deed Book 069E Page 779.

j) Property located at SR1353 off Hooper Lane Road, Henderson County, North Carolina, containing approximately 1.86 acres, and found in Henderson County Deed Book 982 Page 041.

k) Property located at Tract A and Lot 2, J.D. Hooper Estate, Henderson County, North Carolina, containing approximately 16.10 acres, and found in Henderson County Deed Book 982 Page 796.

l) Property located at 112 Smith Cove Road, Buncombe County, North Carolina, containing approximately 1.00 acres, and found in Buncombe County Deed Book 2087 Page 515.

m) Property located on Lower Beaverdam Loop Road, Buncombe County, North Carolina, containing approximately 2.53 acres, and found in Buncombe County Deed Book 2184 Page 893.

n) Property located off of Dave Whitaker Road, Henderson County, North Carolina, containing approximately 1.35 acres, and found in Henderson County Deed Book 1021 Page 227.

o) Property located off of Dave Whitaker Road, Henderson County, North Carolina, containing approximately 155.86 acres, and found in Henderson County Deed Book 1073 Page 45.

42

p) Property located on Miller Road, Spartanburg County, South Carolina, containing approximately 102.44 acres, and found in Spartanburg County Deed Book 072E Page 580.

q) Property located at 46 Billy Cove Road, Buncombe County, North Carolina, containing approximately 1.13 acres, and found in Buncombe County Deed Book 2330 Page 820.

r) Property located on Beaverdam Loop Road, Buncombe County, North Carolina, containing approximately 4.30 acres, and found in Buncombe County Deed Book 2386 Page 388.

s) Property located on SR1345 on North Mills River, Henderson County, North Carolina, containing approximately 84.62 acres, and found in Henderson County Deed Book 1048 Page 325.

t) Property located on North Bull Hill Road, Laurens County, South Carolina, containing approximately 132.89 acres, and found in Laurens County Deed Book 535 Page 312.

u) Property located at 115 Casey Road in Spartanburg County, South Carolina, containing approximately 5.0 acres, and found in Spartanburg County Deed Book 073Y Page 962.

v) Property located off of Smith Cove Road, Buncombe County, North Carolina, containing approximately 115 acres, and found in Buncombe County Deed Book 1730 Pages 699, which was substituted for a Hartford Financial Services Group, Inc., annuity, account number 710473987.

43

(3) All title and interest in the following personal property, in that such property was involved in the aforestated offenses or is traceable to such property:

| Year | Make | Model | VIN | Tag | Purchase Date |
|------|------|-------|-----|-----|---------------|
| 2000 | Ford | Ranger TK | 1FTYR11V1YPB15153 | NXN-8327 | 04/12/01 |
| 2001 | Dodge | Ram TK | 3B7HF13YX1M542262 | LWA-7374 | 04/03/01 |
| 2000 | Chevrolet | TK | 1GCEK19T6YE215450 | NPD-2140 | 06/15/00 |
| 1995 | Ford | TK | 1FTEF14H7SNB24444 | MTT-7305 | 05/17/00 |
| 1995 | Ford | TK | 1FTEF14NXSNA67128 | MTT-7110 | 05/11/00 |
| 1996 | Ford | TK | 1FTEF14N3TLC02981 | MTT-7112 | 05/08/00 |
| 2000 | Cadillac | MP | 1GYEK13R4YR106940 | MTN-2780 | 09/29/99 |
| 1999 | Dodge | Ram TK | 3B6MF3665XM537987 | CD-8907 | 12/31/98 |

A TRUE BILL



GRAND JURY FOREMAN

ROBERT J. CONRAD, JR.
UNITED STATES ATTORNEY

RICHARD LEE EDWARDS
ASSISTANT UNITED STATES ATTORNEY

44